# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **VALENTIN BELEVICH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | Civil Action Number |
| **KLAVDIA THOMAS and** | ) | **2:17-cv-1193-AKK** |
| **TATIANA KUZNITSNYNA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Valentin Belevich came to the United States based on an Affidavit of

Support Klavdia Thomas and her mother Tatiana Kuznitsnyna signed. Under the

relevant law, Thomas and Kuznitsnyna agreed they would support Belevich while

he resided in the United States if his income fell below 125% of the Federal

Poverty level. Sometime after Belevich arrived in the United States, his

relationship to Kuznitsnyna deteriorated, leading to divorce proceedings. The

Defendants ceased to provide him the relevant support they promised when they

sponsored his entry into the United States. Consequently, Belevich brings this

action against Thomas and Kuznitsnyna under the Immigration and Nationality

Act, 8 U.S.C. §§ 1101 *et seq.* ("INA") for breach of contract and intentional

infliction of emotional distress. Doc. 1. Belevich and the Defendants have moved

for summary judgment, docs. 53, 58, and Belevich has moved to strike the

Defendants' reply to their motion, doc. 68. After reviewing the briefs and carefully considering the evidence, *see* docs. 54-57, 59, 61, 65-67, 69, the court finds that Belevich's motion to strike is due to be granted, the Defendants' motion is due to be denied, and Belevich's motion for summary judgment is due to be granted solely as to his claim for support under the INA for the August 8, 2015 to December 31, 2017 period.

## I. STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). At summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v.*

*Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (internal quotations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The simple fact that both sides have filed a motion for summary judgment does not alter the ordinary standard of review. *See Chambers & Co. v. Equitable Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955) (explaining that cross-motions for summary judgment "[do] not warrant the granting of either motion if the record reflects a genuine issue of fact"). Rather, the court will consider each motion separately "'as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004)). "[C]ross motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are

not genuinely disputed." *Bricklayers, Masons & Plasterers Int'l Union v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).

## II. STATUTORY AND REGULATORY BACKGROUND

Under the INA, "immigrants who are likely to become a public charge are ineligible for admission into the United States unless their applications for admission are accompanied by an Affidavit of Support Form I–864." *Younis v. Farooqi*, 597 F. Supp. 2d 552, 554 (D. Md. 2009) (citing 8 U.S.C. §§ 1182(a)(4), (a)(4)(B)(ii), 1183a(a)(1)). The Affidavit of Support is a legally enforceable contract "in which the sponsor agrees to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty level during the period in which the affidavit is enforceable." 8 U.S.C. § 1183a(a)(1)(A); *see*, *e.g.*, *Madrid v. Robinson*, 218 F. Supp. 3d 482, 483 (W.D. Va. 2016). If the petitioning sponsor does not have sufficient annual income to meet the support requirement, another individual with sufficient income may accept joint and several liability for providing the required support. *See* 8 U.S.C. § 1183a(f)(5)(A). If the sponsors fail to provide the required support, the sponsored immigrant may sue them to enforce the Affidavits of Support. *Id*. § 1183a(e)(1). However, a sponsor's obligations under the Affidavit may terminate as a matter of law upon the occurrence of any of six conditions stated in federal regulations and

in the Form I-864. Specifically, the sponsor's obligations terminate if the sponsored immigrant:

> (A) [b]ecomes a citizen of the United States; (B) [h]as worked, or can be credited with, 40 qualifying quarters of work under title II of the Social Security Act . . . ; (C) [c]eases to hold the status of an alien lawfully admitted for permanent residence and departs the United States . . .; (D) [o]btains in a removal proceeding a new grant of adjustment of status as relief from removal . . .; or (E) [d]ies.

8 C.F.R. § 213a.2(e)(2)(i); *see* 8 U.S.C. § 1183a(a)(2)-(3); *Erler v. Erler*, 824 F.3d 1173, 1176 (9th Cir. 2016) (citing 8 C.F.R. § 213a.2(e)(2)(i)); doc. 54 at 22, 39. Additionally, "the support obligation under an affidavit of support . . . terminates if the sponsor . . . or joint sponsor dies." 8 C.F.R. § 213a.2(e)(2)(ii); *see* doc. 54 at 22, 39 (stating this condition in the Form I-864).[1]

### III. FACTUAL BACKGROUND

This case arises from a dispute over the enforcement of an Affidavit of Support. In June 2011, Kuznitsnyna, a Russian immigrant to the United States, and her daughter, Thomas, a naturalized U.S. citizen from Russia, both executed Affidavit of Supports to sponsor the immigration of Kuznitsnyna's husband,

---

[1] However, divorce does not terminate a sponsor's obligations. *See Erler*, 824 F.3d at 1177; *Liu v. Mund*, 686 F.3d 418, 419–20 (7th Cir. 2012), *as amended* (July 27, 2012) ("The right of support conferred by federal law exists apart from whatever rights [the sponsored immigrant] might or might not have under Wisconsin divorce law."); doc. 54 at 22, 39.

Belevich, from Russia. Docs. 54 at 33-40, 16-25; 55 at 18-19; 56 at 12-13.[2]

Following approval by the Department of Homeland Security, Belevich immigrated to the U.S. in March 2012. Docs. 33 ¶ 20; 1 ¶ 20; 56 at 13. From that time through July 2015, Belevich lived with Kuznitsnyna in Pelham, Alabama, and Thomas managed the couple's finances. Docs. 54 ¶ 3. Specifically, Belevich would give his income to Kuznitsnyna, who then gave this money to Thomas. Doc. 56 at 14. Thomas also received wire transfers from her brother and sister-in-law in Russia, which Belevich and Kuznitsnyna told her came out of their pension accounts in Russia. Doc. 56 at 9-10. Thomas would then use the income and funds to pay Belevich's and Kuznitsnyna's bills and other living expenses. Docs. 54 ¶ 3; 56 at 14. Thomas also provided Belevich with a credit card and cell phone, and managed his accounts for both. Doc. 56 at 14.[3]

In August 2015, Belevich flew to Russia to visit his mother on a roundtrip ticket purchased by Thomas. Doc. 54 ¶ 4. During this trip, Thomas informed Belevich that Kuznitsnyna was filing for divorce, and that she would mail his

---

[2] The record also shows that Kuznitsnyna filed an I-130 Petition for Alien Relative on Belevich's behalf in 2008, and that Thomas executed an I-864 Affidavit of Support on Belevich's behalf in February 2011. Doc. 54 at 41-42, 25-32.

[3] The Defendants contend that Belevich has failed to establish that Thomas provided and managed Belevich's credit card, that Belevich provided his income to Thomas via Kuznitsnyna, and that Belevich organized money transfers from Russia. However, they cite to portions of Kuznitsnyna's deposition transcript that do not appear to contradict any of these assertions. *See* doc. 66 at 5 (citing doc. 55 at 20-21).

personal belongings to him. Doc. 59 at 8. Kuznitsnyna confirmed this, and told Belevich over the phone, "Also, when you come back, don't get close to the house, [sic] if you do, I'll call the police[.]" Docs. 55 at 21; 59 at 8. Apparently acting on Kuznitsnyna's instructions, and without Belevich's consent, Thomas cancelled Belevich's ticket for his return flight, his cell phone account, and his credit card account. Doc. 56 at 14, 17. Belevich experienced "severe stress and anxiety," which caused him to suffer a minor heart attack, hospitalizing him for twelve days. Doc. 54 ¶ 6; 59 at 12. Afterwards, Belevich returned to the United States on a ticket purchased by his son. Doc. 53 ¶ 7.

Belevich was temporarily homeless upon his return because the Defendants did not allow Belevich to return to his former home in Pelham, but he subsequently moved into the home of his friend and former employer. Docs. 56 at 18; 54 ¶ 8; 59 at 4. Since 2016, Belevich has only worked "occasional job[s]," such as cutting grass or repairing lawnmowers for neighbors. Doc. 59 at 16. However, since the end of July 2015, the Defendants have not provided any money or financial support to Belevich. Docs. 55 at 22; 56 at 18. Consequently, Belevich filed this lawsuit, alleging breach of contract and the tort of outrage, and seeking damages, specific performance, and attorney's fees and other costs of collection. *See* doc. 1.

## IV. ANALYSIS

Three motions are before the court: (1) Belevich's motion to strike the Defendants' "reply" brief and attached exhibits, doc. 68; (2) the Defendants' partial motion for summary judgment solely on the breach of contract claim, doc. 58;[4] and (3) Belevich's motion for summary judgment on both claims, doc. 53. The court addresses each of these motions in turn.

### A. **Belevich's Motion to Strike**

Belevich asks the court to strike the Defendants' brief and accompanying exhibits, styled as a "Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment." Docs. 68, 67. The Defendants' "reply" brief contends, based on previously undisclosed evidence, that Belevich lied about his income, employment, and home address. *See* doc. 67 at 2-4. However, as Belevich notes, the Defendants did not raise these issues in their motion for summary judgment, and Belevich did not raise these issues in his response to the Defendants' motion. *See* docs. 68 at 4-5; 58; 65. Rather, the "reply" brief responds to Belevich's contentions in his motion for summary judgment regarding his income, *see* doc. 53 at 6-12, to which the Defendants had already responded without raising these issues, *see* doc. 66 at 4-11.

_____

[4] Although the Defendants style their motion as a "motion for summary judgment," their brief only addresses the breach of contract claim. *See* doc. 58. In the absence of any arguments in their motion related to the outrage claim and because "the style of a motion is not controlling," the court construes the Defendants' motion as a motion for partial summary judgment solely on the breach of contract claim. *See Finch v. City of Vernon*, 845 F.2d 256, 258 (11th Cir. 1988).

"District courts, including this one, ordinarily do not consider arguments raised for the first time on reply[,]" and the court declines to do so here, where there is no apparent explanation for the untimeliness of the newly raised contentions and evidence. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. J.F. Morgan Gen. Contractors, Inc.*, 79 F. Supp. 3d 1245, 1256 (N.D. Ala. 2015) (quoting parenthetically *White v. ThyssenKrupp Steel, USA, LLC,* 743 F. Supp. 2d 1340, 1357 (S.D. Ala. 2010)). Alternatively, in light of the content of the Defendants' "reply" brief, the court construes the brief as a supplementary response to Belevich's motion for summary judgment, for which the Defendants did not seek leave to file. *See Finch v. City of Vernon*, 845 F.2d 256, 258 (11th Cir. 1988) (noting that "the style of a motion is not controlling"). "[O]rdinarily, sur-replies can only be filed with leave of court and are ordinarily stricken if no such leave is requested or received." *Scottsdale Ins. Co. v. Calhoun Hunting Club and Lounge*, 360 F. Supp. 3d 1262, 1268 n.3 (M.D. Ala. 2018) (citation and quotation marks omitted). Therefore, the brief and its attachments are due to be stricken.[5]

---

[5] In any event, the Defendants' brief and attached exhibits do not establish that the Defendants are entitled to summary judgment. The Defendants contend, based on the affidavit of private investigator Ronald D. White and other attached exhibits, that Belevich is currently earning income from Dmitri Kerobeinikov's business because Belevich "travels daily to work every weekday" at a "junk yard." *See* docs. 67 at 2-3; 67-1 at 2. However, White's affidavit does not explain how he knows that Belevich is earning money from Kerobeinikov. *See* doc. 67-1. At most, White's affidavit indicates that Belevich travels daily on weekdays to a "junk yard" owned by Kerobeinikov. *See id.* And, the attached tax records, vehicle registration report, and mortgage note do not indicate, on their face, that Belevich misrepresented his address, income, or employment. The tax records concern parcels purportedly owned by "Anton Borovjagin" and

9

## B. <u>The Defendants' Motion for Partial Summary Judgment</u>

The Defendants have moved for summary judgment solely on the breach of contract claim, contending that their obligations under the Affidavits of Support have terminated. *See* doc. 58. Specifically, the Defendants argue that their obligations terminated because Belevich became "subject to removal" when an Alabama court issued a protective order against him or, alternatively, when he was charged with aggravated felonies. Doc. 58 at 2-5 (citing docs. 58-1 at 30, 39-47). The Defendants appear to rely on the following language from the Form I-864:

> Your obligations under a Form I-864 will end if the person who becomes a permanent resident based on a Form I-864 that you signed:
> . . .
> Becomes <u>subject to removal</u>, but applies for and obtains in removal proceedings a new grant of adjustment of status, based on a new affidavit of support, if one is required; . . .

Doc. 54 at 22, 39 (emphasis added). However, even assuming the Defendants' obligations terminated due to either of the alleged terminating events, the Defendants could still be held liable for any breach of their obligations that occurred prior to the termination. As the regulations state unequivocally, "[t]he termination of the sponsor's . . . or joint sponsor's obligations under an affidavit of support . . . does not relieve the sponsor . . . [or] joint sponsor . . . of any

---

"Zetta Real Estate Inc.," respectively, and do not mention Belevich. Doc. 67-1 at 5, 9. The mortgage note indicates that Kerobeinikov, Belevich's friend and former employer, executed a mortgage on behalf of Zetta Real Estate, but again does not mention Belevich. Doc. 67-1 at 10-12. In fact, the vehicle report is the only exhibit that mentions Belevich, and it does not contradict Belevich's testimony about his current home address. *See* docs. 67-1 at 7; 59 at 4.

reimbursement obligation . . . that accrued before the support obligation terminated." 8 C.F.R. § 213a.2(e)(3). Thus, the alleged termination of their obligations does not shield them from liability.

Moreover, the Defendants' argument misconstrues the cited terminating condition. Even though the Form I-864 adds language not contained in the regulation—that the sponsored immigrant must become "subject to removal" and "appl[y] for" a new grant of adjustment of status—this condition is substantively indistinguishable from the one described in 8 C.F.R. § 213a.2(e)(2)(i)(D).[6] *See Erler*, 824 F.3d at 1176-77 (noting that the Form I-864 "reproduces" the conditions enumerated in 8 C.F.R. § 213a.2(e)(2)(i)).[7] According to the regulation—and also under the plain language of the Form I-864—that a sponsored immigrant becomes "subject to removal" does not terminate the sponsors' obligations: rather,

_____

[6] The full text of 8 C.F.R. § 213a.2(e)(2)(i)(D) states that a sponsor's "support obligation . . . terminate[s] by operation of law when the sponsored immigrant: . . .

    (D) Obtains in a removal proceeding a new grant of adjustment of status as relief from removal (in this case, if the sponsored immigrant is still subject to the affidavit of support requirement under this part, then any individual(s) who signed an affidavit of support or an affidavit of support attachment in relation to the new adjustment application will be subject to the obligations of this part, rather than those who signed an affidavit of support or an affidavit of support attachment in relation to an earlier grant of admission as an immigrant or of adjustment of status); or . . ."

[7] The added language in the Form I-864 appears to express an unstated assumption underlying the regulation: that the sponsored immigrant must have become "subject to removal" in order to have "obtain[ed] in a removal proceeding a new grant of adjustment of status as relief from removal." 8 C.F.R. § 213a.2(e)(2)(i)(D); *see* 8 U.S.C. § 1229a (describing the "proceedings for deciding the . . . deportability of an alien").

termination requires that the sponsored immigrant "obtain[] in a removal proceeding a new grant of adjustment of status . . ." 8 C.F.R. § 213a.2(e)(2)(i)(D); *see* doc. 54 at 22, 39. However, the Defendants have not cited any evidence that Belevich is under a removal proceeding, let alone that he has obtained a new grant of adjustment of status. As this court has previously noted, that Belevich was subject to a protective order and currently faces "pending charges is irrelevant to this court's inquiry regarding whether the Defendants are obligated to provide support to Belevich as they represented to the Government that they would do when they sponsored him." Doc. 45 at 2. Therefore, the Defendants' motion is due to be denied.

## C. **Belevich's Motion for Summary Judgment**

Belevich has moved for summary judgment on both of his claims. The court addresses each of these claims separately.

### 1. Breach of Contract

Belevich contends that the Defendants have been in breach of their obligations under the Affidavit of Support since August 8, 2015. Doc. 53 at 8-10. The Defendants concede this point, albeit they contend they no longer have an obligation to provide support to Belevich. Docs. 55 at 18-19, 22; 56 at 12-13, 18. However, this admission alone does not establish liability: Belevich must also show that his income was below the 125% poverty threshold during the relevant

period. *See Celotex*, 477 U.S. at 323; *Shumye*, 555 F. Supp. 2d at 1029 (finding plaintiff had burden to establish his income for relevant period under I-864 Affidavit for Support). Courts have employed two different approaches in calculating the sponsored immigrant's income and the 125% poverty threshold to determine liability and damages: some compare the immigrant's aggregate income for the relevant period with the sum of the 125% poverty thresholds during those years, *see Allen v. Goard*, No. 14-61147-CIV, 2015 WL 11110863, at *3 (S.D. Fla. Apr. 1, 2015), while others compare the immigrant's annual income for each year at issue with the 125% poverty threshold for each year, *see Younis*, 597 F. Supp. 2d at 554; *Shumye v. Felleke*, 555 F. Supp. 2d 1020, 1024-25 (N.D. Cal. 2008). The court believes that the latter "annual" approach is more faithful to the statute, which requires sponsors to maintain the sponsored immigrant "at an <u>annual</u> income" that is not less than the 125% poverty threshold, 8 U.S.C. § 1183a(a)(1)(A) (emphasis added), and defines "Federal poverty line" as "the level of income equal to the official poverty line (as defined by the Director of the Office of Management and Budget, as revised <u>annually</u> by the Secretary of Health and Human Services, in accordance with section 9902(2) of Title 42) that is applicable to a family of the size involved," *id*. § 1183a(h) (emphasis added). Applying this approach, the court now turns to the issue of calculating Belevich's annual income for the relevant years.

### a. Whether Belevich's Income Includes His Pension from the Russian Federation.

Belevich contends that the court should not include his pension from the Russian Federation in calculating his annual income because he could not and cannot access the funds here in the United States. Doc. 54 at 4. Notably, neither the statute nor the regulations define "income" with respect to the sponsored immigrant's income. *See* 8 U.S.C. § 1183a; *cf.* 8 C.F.R. § 213a.1(2) (defining "income" only in relation to the sponsor's minimum income level). In the absence of a statutory definition, courts have generally interpreted a sponsored immigrant's "income" expansively, including the immigrant's government benefits, educational grants, and alimony, if any.[8] The court is aware of only one case that considered whether a sponsored immigrant's income includes foreign pension funds. In *Erler v. Erler*, the Northern District of California held, on remand from the Ninth Circuit, that the sponsored immigrant's income included her pension funds in Turkey, notwithstanding her contention, like Belevich, that she was unable to access her pension in the United States. No. 12-CV-02793-CRB, 2017 WL 5478560, at *8–9 (N.D. Cal. Nov. 15, 2017). Critically, the immigrant's daughter

---

[8] *See Toure-Davis v. Davis*, No. WGC-13-916, 2015 WL 993575, at *6 (D. Md. Mar. 4, 2015) (finding that "housing subsidy," provided by allowing the immigrant to live rent free in third-party's home, constituted "income"); *Younis*, 597 F. Supp. 2d at 554 (finding alimony payments constituted "income," but child support payments did not because they were not for the benefit of the sponsored immigrant); *Shumye*, 555 F. Supp. 2d at 1026 (holding that immigrant's educational grants and affordable housing subsidies constituted "income").

in Turkey could access the pension, indicating that the immigrant could have accessed the funds by "arrang[ing] a transfer with her daughter[.]" *Id*. at *8.

Similarly, the record before the court shows that Belevich has had access to his pension at least since the beginning of the alleged breach. Belevich, like the immigrant in *Erler*, declares that his pension funds are not accessible to him, that he has not received any pension funds in the United States or in his financial account in Russia, and that these funds are held by the Russian Federation unless and until he returns to Russia. Doc. 54 at 4. Although, "[a]s a general principle, a plaintiff's testimony cannot be discounted on summary judgment[,]" the court must discount Belevich's testimony because "it is blatantly contradicted by the record" and "blatantly inconsistent." *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253-54 (11th Cir. 2013) (citations omitted). First, Belevich contradicts his declaration in his deposition, stating, "[C]urrently, I do not have any income. I live just on my pension and something what [sic] my son sends to me." Doc. 59 at 16 (emphasis added). Furthermore, as Belevich concedes in his brief, Thomas, and her son and daughter-in-law in Russia, previously had access to funds from Belevich's pension: before the alleged breach, Thomas received wire transfers in the United States from Thomas' son and daughter-in-law in Russia, which Belevich told Thomas were from his Russian pension account. Doc. 53 at 4 n.2 (citing doc. 56 at 9-10). Thus, although Belevich may not have directly received his pension funds in

the United States, Thomas' receipt of funds from Belevich's pension prior to the alleged breach indicates that Belevich could have accessed his pension funds even after the Defendants stopped supporting him. Finally, that Belevich reported his pension earnings as income on his annual tax returns for 2015, 2016, and 2017 demonstrates also that he had access to these funds. *See* doc. 54 at 4, 8-13; *infra* Section III-C-1-b. Accordingly, the court concludes that Belevich had and has access to his Russian pension funds in the United States, and that his income during the period of alleged breach includes these funds.

### b. Whether Belevich's Income Was Below the 125% Poverty Threshold in 2015, 2016, and 2017.

Belevich contends that, even if his income includes his Russian pension funds, he still had an annual income below the 125% poverty threshold during the relevant period and, therefore, he is entitled to summary judgment on the issue of liability. *See* doc. 53. For the relevant portion of 2015 (August 8 – December 31, 2015),[9] 2016, and 2017, Belevich has produced copies of his tax returns. *See* doc. 54 at 4, 8-13. These returns indicate that his sole source of income in 2015 was his pension, but that he earned income in 2016 and 2017 from his pension and

---

[9] Because the Defendants were only allegedly in breach for part of 2015, the court prorates Belevich's annual income and the 125% poverty threshold for this period of the alleged breach. *See, e.g.*, *Santana v. Hatch*, No. 15-CV-89-WMC, 2016 WL 7217860, at *1 (W.D. Wis. Dec. 13, 2016) (prorating sponsored immigrant's income and poverty threshold where less than a year was at issue); *Hrachova v. Cook*, No. 5:09-cv-95-Oc-GRJ, 2009 WL 3674851, at *4 (M.D. Fla. Nov. 3, 2009) (same); *Younis*, 597 F. Supp. 2d at 557 (same).

"business income," which he appears to have earned from performing "occasional job[s]." *See id.*; doc. 59 at 16. The tax returns indicate his total annual income for August 8, 2015 through the end of 2017 was as follows:[10]

- **August 8 – December 31, 2015:**[11] (2,400 (total annual income) / 365) x 146 = $960.00
- **2016:** $5,160.00
- **2017:** $5,480.00

*See id.* Moreover, according to the applicable HHS regulations, the 125% federal poverty thresholds for a one-person household in Alabama[12] during these years were as follows:

- **August 8 – December 31, 2015:** ((11,770 (federal poverty line) x 1.25) / 365) x 146 = $5,885.00
- **2016:** 11,880 x 1.25 = $14,850.00
- **2017:** 12,060 x 1.25 = $15,075.00

---

[10] For his annual income in 2016 and 2017, Belevich cites the amounts reported for his "adjusted gross income," rather than his "total income," on his tax returns for those years. *See* docs. 53 at 12; 54 at 10, 12. However, Belevich cites no authority, and the court is not aware of any, for using "adjusted gross income" when calculating a sponsored immigrant's income. *See* doc. 53. Accordingly, the court uses the amounts reported for Belevich's "total income" in 2016 and 2017 in order to determine his annual income for those years.

[11] For the relevant portion of 2015, the court notes that Belevich appears to have calculated his income *pro rata* since August 1, 2015, rather than August 8, 2015, resulting in a different figure from the court's calculations. *See* doc. 53 at 12. However, Belevich apparently calculated the prorated 125% poverty threshold as of August 8, 2015. *See id.* Because Belevich contends that the Defendants stopped providing him financial support on August 8, 2015, and the record supports that testimony, the court calculates both Belevich's prorated income and the 125% poverty threshold using the starting date of August 8, 2015. *See* docs. 54 at 4; 53 at 10.

[12] The appropriate 125% federal poverty threshold in this case is based on a one-person household in the contiguous United States. *See* 8 U.S.C. § 1183a(h); *Erler*, 824 F.3d at 1178 ("[I]n the event of separation, the sponsor's duty of support must be based on a household size that is equivalent to the number of sponsored immigrants living in the household.").

*See* 8 U.S.C. § 1183a(h) (defining "Federal poverty line"); 80 FR 3236-03, 2015 WL 256377, at *3237 (Jan. 22, 2015); 81 FR 4036-01, 2016 WL 279298, at *4036 (Jan. 25, 2016); 82 FR 8831-03, 2017 WL 395763, at *8832 (Jan. 31, 2017). These figures demonstrate that Belevich's income for the relevant part of 2015, and all of 2016 and 2017, was below the 125% poverty threshold, thereby showing that the Defendants were in breach of their obligations during this period.

The burden therefore shifts to the Defendants to raise a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. In their effort to do so, the Defendants contest the authenticity of Belevich's 2016 and 2017 tax returns based on the fact that the returns are unsigned. Doc. 66 at 10. Although these type-written returns from 2016 and 2017 are unsigned, Belevich attests in his sworn declaration that they are "true and correct" copies of his tax returns, and the returns state that they were "self-prepared." Doc. 54 at 4, 11, and 13. The Defendants have not introduced any evidence tending to dispute the authenticity of these returns or suggest that Belevich had additional sources of income during this period. *See* doc. 66. Accordingly, even drawing all reasonable inferences in their favor, the Defendants have not raised a genuine issue of material fact as to whether Belevich's annual income was below the 125% poverty threshold from August 8, 2015 through the end of 2017. *See Celotex*, 477 U.S. at 323; *Shumye*, 555 F. Supp.

2d at 1029. Therefore, the Defendants were in breach of the Affidavits of Support during that period.

### c. Whether Belevich's Income Was Below the 125% Poverty Threshold During 2018 and 2019.

Belevich also contends that his income was below the 125% poverty threshold in 2018 and January through March of 2019. Doc. 53 at 11-12. Instead of providing tax documents for this period, Belevich cites to portions of his deposition in which he testified, on December 19, 2018, that he "currently does not have any income" and that his pension in Russia accrues at a rate of approximately $280 per month. *See* doc. 59 at 16, 13. However, this testimony does not address whether the pension has accrued at that rate since January 2018, or whether Belevich has received any income since the beginning of 2018. *See id.* at 16. Moreover, drawing all reasonable inferences in favor of the Defendants, the court cannot assume, based on the cited testimony, that Belevich received no other income in 2018 or 2019, especially in light of his testimony that he has performed "occasional job[s]" since 2016. *Id.* Nor can the court assume that his pension has accrued at a constant rate of $280 per month since January 2018 in light of the varying pension amounts Belevich reported on his annual tax returns in 2015, 2016, and 2017. *See* docs. 54 at 8, 10, 12. Accordingly, Belevich has not met his initial burden, and the court cannot conclude, at this juncture, that Belevich's income was below the 125% poverty threshold in 2018 and 2019. *See Celotex*, 477

U.S. at 323; *Shumye*, 555 F. Supp. 2d at 1029 (denying sponsored immigrant's motion for summary judgment where "she submit[ted] no testimony or other competent evidence that establishe[d], as an undisputed fact, that her income did not exceed the 125% federal poverty threshold.").

> ### d. Whether Belevich's Alleged Negligence Excuses the Defendants' Breach.

In response to Belevich's motion, the Defendants contend that the court should excuse their breach of the Affidavits of Support because Belevich's purported negligence caused the breach. *See* doc. 66. Specifically, the Defendants contend that the Form I-864 contains "indemnity provision[s]," obligating sponsors to indemnify the sponsored immigrant as a "[third] party indemnitee."[13] The

---

[13] The Defendants cite the following language in the Form I-864:

**What is the Legal Effect of My Signing a Form I-864?**
If you sign a Form I-864 on behalf of any person (called the "intending immigrant") who is applying for an immigrant visa or for adjustment of status to a permanent resident, and that intending immigrant submits the Form I-864 to the U.S. Government with his or her application for an immigrant visa or adjustment of status, under section 213A of the Immigration and Nationality Act these actions create a contract between you and the U.S. Government. The intending immigrant becoming a lawful permanent resident is the "consideration" for the contract.
Under this contract, you agree that, in deciding whether the intending immigrant can establish that he or she is not inadmissible to the United States as an alien likely to become a public charge, the U.S. Government can consider your income and assets to be available for the support of the intending immigrant. . . .
If you do not provide sufficient support to the person who becomes a lawful permanent resident based on a Form I-864 that you signed, that person may sue you for this support.
Doc. 66 at 7-8 (quoting doc. 54 at 21-22, 30-31).

Defendants assert that these "indemnity provision[s]" do not obligate them to "indemnify [Belevich] for his own negligent actions." *Id*. at 8-9.

On their face, the cited provisions do not indicate that the Defendants have contracted to indemnify Belevich, a third party, against losses and liabilities.[14] However, even assuming that an Affidavit of Support creates a contract of indemnity, the Defendants fail to cite any evidence indicating that Belevich's allegedly negligent conduct caused the Defendants to breach their duties of support. *See* doc. 58. Moreover, even if Belevich's negligent conduct did, in fact, cause the Defendants' breach, this would not be a viable defense. Courts have consistently recognized that a sponsor's breach of an Affidavit of Support can only be excused by the conditions enumerated in the Form I-864 and 8 C.F.R. § 213a.2(e)(2)(i)-(ii).[15] Indeed, limiting the excusing conditions to those expressly stated in the regulations and Form I-864 serves "the stated statutory goal" of "prevent[ing] the admission to the United States of any alien who 'is likely at any time to become a public charge.'" *Mund*, 686 F.3d at 422 (quoting 8 U.S.C. §

---

[14] *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) ("Under general contract principles, the plain meaning of a contract's language governs its interpretation."); *A. J. Kellos Const. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 412 (S.D. Ga. 1980) ("A contract of indemnity ordinarily contemplates two parties[:] the indemnitor and the indemnitee. The relationship is defined as 'one where the promisor agrees to save the promisee harmless from some loss, irrespective of the liability of [sic] a third person.'" (citation omitted)).

[15] *See, e.g., Erler*, 824 F.3d at 1177 (recognizing that only the enumerated conditions in the affidavit and regulations terminate the obligation of support); *Wenfang Liu v. Mund*, 686 F.3d 418, 420 (7th Cir. 2012), *as amended* (July 27, 2012); *Li Liu v. Kell*, 299 F. Supp. 3d 1128, 1133 (W.D. Wash. 2017) ("The federal law underlying the I–864 Affidavit clearly specifies the instances in which the support obligation can be avoided." (citation omitted)).

1182(a)(4)(A)); *see Erler*, 824 F.3d at 1179; *Dorsaneo v. Dorsaneo*, 261 F. Supp.

3d 1052, 1054 (N.D. Cal. 2017). As the Seventh Circuit has explained:

> The direct path to that goal would involve imposing on the sponsor a
> duty of support with no excusing conditions. Some such conditions
> are specified; but why should the judiciary add to them . . . ? The only
> beneficiary . . . would be the sponsor—and it is not for his benefit that
> the duty of support was imposed; it was imposed for the benefit of
> federal and state taxpayers and of the donors to organizations that
> provide charity for the poor.

*Mund*, 686 F.3d at 422 (rejecting argument that the Affidavit of Support imposes

on the sponsored immigrant a duty to mitigate damages). Accordingly, the

Defendants' "indemnity contract" defense fails as a matter of law.

### e. Whether Belevich is Entitled to Damages.

Belevich has also moved for summary judgment on the issue of damages.

*See* doc. 53 at 9-15. The appropriate measure of damages for breach of an

Affidavit of Support is that which "would put plaintiff in as good a position as [he]

would have been had the contract been performed." *Younis*, 597 F. Supp. 2d at

554–55 (quoting *Shumye*, 555 F. Supp. 2d at 1024-25); *Stump v. Stump*, No. 1:04-

CV-253-TS, 2005 WL 2757329, at *6 (N.D. Ind. Oct. 25, 2005). Accordingly,

courts calculate damages by subtracting the sponsored immigrant's annual income

from the 125% poverty threshold for each particular year. *See*, *e.g.*, *Younis*, 597 F.

Supp. 2d at 554. As explained above, *supra* Section III-C-1-b, the record before the

court shows that the Defendants were in breach from August 8, 2015 through

December 31, 2017 and, therefore, Belevich is entitled to relief for this period. *See id*. However, because genuine issues of material fact preclude determination of Belevich's income in 2018 and 2019, Belevich has not shown he is entitled to relief for these years. *See supra* Section III-C-1-c.

The differences between Belevich's annual income and the 125% poverty thresholds for August 8, 2015 through December 31, 2017 are as follows:

- **August 8 – December 31, 2015:** $5,885.00 (the 125% poverty threshold) - $960.00 (Belevich's income) = $4,925.00
- **2016:** $14,850.00 - $5,160.00 = $9,690.00
- **2017:** $15,075.00 - $5,480.00 = $9,595.00

Based on these calculations, the Defendants owe Belevich a total of $24,210.00 in damages for this period.

### f.  *Whether Belevich is Entitled to Prejudgment Interest.*

Additionally, Belevich contends that he is entitled to prejudgment interest on damages. Doc. 53 at 13-14. In federal question cases such as this one, the decision of whether to grant prejudgment interest is controlled by federal law. *See Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1447 (11th Cir. 1998). Where, as here, the relevant federal statute is silent regarding prejudgment interest, "traditional equitable principles govern the award of such compensation." *ATM Exp., Inc. v. Montgomery, Ala.*, 516 F. Supp. 2d 1242, 1252 (M.D. Ala. 2007) (citation omitted). Stated differently, "awards of prejudgment interest are equitable remedies, to be awarded or not awarded in the district court's sound discretion."

*Industrial Risk Insurers*, 141 F.3d at 1447. In exercising its discretion, the court is mindful that "pre-judgment interest is not a penalty, but compensation to the plaintiff for use of funds that were rightfully his." *Id*. at 1446-47 (quoting *Ins. Co. of N. America v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir. 1990)).

Applying these principles to the case at bar, the court concludes that the award of prejudgment interest is appropriate here because the purpose behind damages for breach of an Affidavit of Support is to "put plaintiff in as good a position as [he] would have been had the contract been performed," *Younis*, 597 F. Supp. 2d at 554–55. Moreover, awarding prejudgment interest on damages furthers the statutory purpose of preventing the admission of aliens "likely . . . to become a public charge" by "mak[ing] prospective sponsors more cautious about sponsoring immigrants." *Erler*, 824 F.3d at 1179; *see ATM Exp.*, 516 F. Supp. 2d at 1252 (noting that "the decision to grant or deny prejudgment interest hinges on whether to do so would further the congressional purposes underlying the obligations imposed by the statute in question.").

"In the absence of a controlling statute" for calculating the rate of prejudgment interest, the Eleventh Circuit has explained:

> [F]ederal courts' choice of a rate . . . is usually guided by principles of reasonableness and fairness, by relevant state law, and by . . . the rate that federal courts must use in awarding post-judgment interest.

*Industrial Risk Insurers*, 141 F.3d at 1447 (emphasis in original) (citing 28 U.S.C. § 1691 (1992)). In light of this guidance, and because the INA authorizes courts to order "corresponding remedies available under State law" to enforce an affidavit of support, Belevich contends that the court should apply the rate of "6% per annum" prescribed by the Alabama Supreme Court for prejudgment interest where "no written contract controls the interest rate[.]" Doc. 53 at 13 (citing *Burgess Min. and Const. Corp. v. Lees*, 440 So. 2d 321, 338 (Ala. 1983)). However, because the Affidavit of Support is a creation of federal statutory law, rather than state law, and because other district courts granting prejudgment interest for breach of Affidavits of Support have done so, the court uses the statutorily-prescribed "rate that federal courts must use in awarding <u>post</u>-judgment interest" to compute the prejudgment interest owed. *See Industrial Risk Insurers*, 141 F.3d at 1447.

In *Erler v. Erler*, the Northern District of California explained:

In calculating the interest rate, the Court uses the 52-week Treasury bill rate, and treats the incoming funds as though they were reinvested annually at the next year's rate. The Court uses the following formula to calculate each year's prejudgment interest accrued to today: (yearly principal owed) x (year-end Treasury bill rate) = annual interest amount. The Court then takes the annual interest amount and divides it by the days in a year (365), and multiplies the quotient by the number of days elapsed since the end of the year in question. The product is the interest that has accrued since the end of the year.

No. 12-cv-02793 CRB (NC), 2018 WL 4773414, at *3 (N.D. Cal. Apr. 11, 2018) (citing *Nelson v. EG & G Energy Measurements Grp., Inc.*, 37 F.3d 1384, 1392

(9th Cir. 1994) (affirming calculation of prejudgment interest for damages in ERISA case)). While the court agrees with this approach, it departs from the *Erler* court's framework in one respect: rather than using "the 52-week Treasury bill rate," which was required by the prior version of the federal statute governing post-judgment interest, the court uses the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System," which is required by the current version of the statute. *See id.*; 28 U.S.C. § 1961 (1992); 28 U.S.C. § 1691 (2000). Specifically, the court uses "the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding" the end of each year that the Defendants were in breach. *See* 28 U.S.C. § 1691 (2000) (requiring courts to use the rate "for the calendar week preceding[] the date of the judgment"). Accordingly, with this one exception, the court applies the *Erler* court's formula to the relevant data as follows:

| | Yearly Principal Owed | Relevant Treasury Yield Rate[16] | Annual Interest Amount | Daily Interest Amount | Days Elapsed Since End of Year | Interest Accrued Since End of Year |
|---|---|---|---|---|---|---|
| **August 8 – December** | 4,925.00 | 0.0065 | 32.01 | 0.09 | 1,267 | $114.03 |

[16] For the yearly principals in 2015, 2016, and 2017, the court applies the weekly average 1-year constant maturity Treasury yield as published on December 25, 2015, December 30, 2016, and December 29, 2017, respectively. *See Data Download*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=baf5b6bc360d9 6888021f4c7b4b061f5&filetype=spreadsheetml&label=include&layout=seriescolumn&from=08 /08/2015&to=12/31/2017 (last visited June 19, 2019).

| 31, 2015 | | | | | | |
|---|---|---|---|---|---|---|
| **2016** | 9,690.00 | 0.0087 | 84.30 | 0.23 | 901 | $207.23 |
| **2017** | 9,595.00 | 0.0176 | 168.87 | 0.46 | 536 | $246.56 |
| **Sum** | | | | | | **$567.82** |

Therefore, for the period of August 8, 2015 through December 31, 2017, the court awards Belevich $567.82 in prejudgment interest.

> g. *Whether Belevich is Entitled to Specific Performance and Attorney's Fees.*

Finally, Belevich contends that he is entitled to attorney's fees and costs of collection, as well as specific performance. *See* 8 U.S.C. § 1183a(c) (authorizing courts to award "specific performance and payment of legal fees and other costs of collection"). As Belevich is represented by counsel and has shown breach of the Affidavit of Support, the court will allow him to move for reasonable attorney's fees and costs as the prevailing party. *See*, *e.g.*, *Toure-Davis v. Davis*, No. WGC-13-916, 2015 WL 993575, at *6 (D. Md. Mar. 4, 2015) (allowing prevailing plaintiff to move for attorney's fees and costs in action for breach of Affidavit of Support). However, because genuine issues of material fact remain regarding whether the Defendants have been in breach since January 1, 2018, the court declines to award specific performance at this juncture.

### 2. Intentional Infliction of Emotional Distress

Belevich has also moved for summary judgment on his claim of the tort of outrage, also known as intentional infliction of emotional distress. *See* doc. 53 at

16. To recover on his outrage claim, Belevich must demonstrate that the Defendants' conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused Belevich emotional distress so severe that no reasonable person could be expected to endure it. *See*, *e.g.*, *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043-44 (Ala. 1993). To prove his claim, Belevich cites the following evidence from the record: after Belevich arrived in Russia in August 2015, the Defendants informed him of Kuznitsnyna's plan to divorce him; Thomas cancelled Belevich's return flight from Russia, his credit card account, and his cell phone account without his consent; and Kuznitsnyna told Belevich she would call the police if he attempted to enter their former marital home. Docs. 55 at 21; 59 at 8; 56 at 14, 17. This conduct purportedly caused Belevich "severe stress and anxiety," which culminated in a minor heart attack. Doc. 54 ¶ 6; 59 at 12. After Belevich returned to the United States, the Defendants did not give Belevich permission to stay at or retrieve his belongings from his former home and stopped supporting Belevich financially, rendering him temporarily homeless. Docs. 56 at 18; 54 ¶ 8.

Based on this record, which the Defendants dispute, *see* doc. 66 at 4-6, 11-12, summary judgment is inappropriate. Moreover, even if all of Belevich's contentions were true, the court cannot conclude, as a matter of law, that the Defendants' conduct satisfies the second element of the tort of outrage—that the

conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Little*, 72 So. 3d at 1173 (quoting *Horne v. TGM Assocs., L.P.,* 56 So. 3d 615, 631 (Ala. 2010)). Under Alabama law, "[t]he tort of outrage is an extremely limited cause of action." *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, 266 So. 3d 674, 676-677 (Ala. 2017), *reh'g denied* (June 15, 2018). Consequently, Alabama courts have historically recognized the tort in only three situations: "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Id.* (citations omitted). While the tort of outrage is cognizable outside of these three situations, a finding that challenged conduct is "extreme and outrageous" is exceedingly rare. *See Little v. Robinson*, 72 So. 3d 1168, 1173 (Ala. 2011); *O'Rear v. B.H.*, 69 So. 3d 106, 118-19 (Ala. 2011), *abrogated on other grounds by Ex Parte Vanderwall*, 201 So. 3d 525 (Ala. 2015) (finding "extreme and outrageous" conduct where a family physician prescribed drugs to a boy in exchange for sex over several years, resulting in the boy's drug addiction). Here, the challenged conduct does not fall into any of the three categories, and the court is not aware of any case finding "extreme and outrageous" conduct in the context of a contentious spousal or romantic

relationship (other than where there has been egregious sexual harassment).[17] In light of the high standard imposed by Alabama law, the court cannot find that the Defendants' efforts to isolate and cut ties with Belevich amount to conduct that is "extreme and outrageous." *See* doc. 58-1 at 30. Accordingly, the court declines to grant Belevich's motion as to his claim for the tort of outrage. The claim remains in the case, however, in light of the Defendants' failure to move for summary judgment.

## V. CONCLUSION

In light of the foregoing, the court finds that Belevich's motion to strike, doc. 68, is due to be granted, the Defendants' motion for partial summary judgment, doc. 58, is due to be denied, and Belevich's motion for summary judgment, doc. 53, is due to be granted solely as to the contract claim for the August 8, 2015 to December 31, 2017 period. The court will issue a separate order consistent with this opinion.

---

[17] *See Wright v. Wright*, 654 So. 2d 542 (Ala. 1995) (upholding trial court's grant of summary judgment against plaintiff on tort of outrage claim, where she testified defendant, her estranged husband, beat her before and after they separated); *Harris v. McDavid*, 553 So. 2d 567, 570 (Ala. 1989) (finding defendant's conduct failed to "rise to the level of outrageous conduct" where defendant, plaintiff's former employer, had enticed her with promises of marriage to leave her husband and move to his hometown; had had a sexual affair with her, causing her to become pregnant; had convinced her to have an abortion; and then had ended their personal and business relationships).

**DONE** the 20th day of June, 2019.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE